**Michael J. McDONALD et al., Plaintiffs,**

v.

**Harold OLIVER et al., Defendants.**

**Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**LOCAL UNION 795, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, et al., Defendants.**

**Civ. A. Nos. 735–263(R), S74–55(R).**

United States District Court,
S. D. Mississippi, S. D.
Sept. 26, 1974.

Alben N. Hopkins, Gulfport, Miss., for Michael J. McDonald and others.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., for Dept. of Labor.

Charles T. Sykes, Jr., Gulfport, Miss., for defendants.

## OPINION OF THE COURT

DAN M. RUSSELL, Jr., Chief Judge.

On November 23, 1973, Michael J. McDonald and other individually named

plaintiffs, claiming to be the duly elected officers of Local 795, International Longshoremen's Association, AFL–CIO, at Gulfport, Mississippi, filed this action against Harold Oliver and other individual hold-over officers, Local 795, Fred R. Field, Jr., Trustee over the local and the ILA. Claiming jurisdiction under Titles I and III of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401, 462, 463 and 464, plaintiffs charge in Count I a conspiracy among ILA, its officers and agents, Field and Oliver to perpetuate the trusteeship over Local 795, coercing and intimidating a majority of the members and especially its duly elected officials, plaintiffs herein, and to prohibit by illegal means the installation and formal recognition of plaintiffs as the duly elected officers of Local 795 in an election held on October 6, 1973. Plaintiffs charge that the defendants individually and in concert and under the cover of the trusteeship have eliminated jobs for members not espousing defendants' views, refused payment of dues by members who chose to run for office against the trusteeship regime, refused work to members who opposed the corrupt practices of the trusteeship, and redrafted rules and regulations so as to destroy any semblance of democratic government or fair dealing within the local union. Plaintiffs allege that any exhaustion of intraunion remedies required decisions by those already committing wrongs and illegal acts and served only to perpetuate and compound the inequities. In Count II, plaintiffs allege that on May 1, 1971, Local 795 was placed in trusteeship. In a trustee's report to the Department of Labor under date of October 31, 1972, a copy being attached to the complaint, the report reflects that the trusteeship resulted from charges brought by a majority of the elected officials and more than 100 members of Local 795, the charges including but not limited to: (a) the president of the local (Oliver) solicited new members into the local and industry when there was insufficient work available; (b) the president (Oliver), by controlling the appointment of foremen, controlled the hiring practices of a company with which the local had a contract to the detriment of older members with seniority in favor of new men in the industry; (c) upon complaints to management that the foremen were ignoring seniority, management stated that it had nothing to do with the hiring of foremen; (d) the president (Oliver), in collusion with management, usurped the right of all other officers and members of the local to bargain collectively; and (e) the president (Oliver) failed and refused to seek arbitration of grievances as provided for in the collective bargaining agreement after being requested to do so by members or other officers of the local. This report also shows that a committee appointed by the Executive Board of ILA recommended that the local be placed in trusteeship, finding that (a) the president (Oliver) never had any intention of implementing the seniority provisions of the agreement; (b) the superintendents and supervisors were selecting employees without regard to seniority; and (c) the president (Oliver) appointed supervisors to head election committees to maintain control over the local; and, finally, the report shows that the committee's recommendation was adopted by the ILA Executive Council, the trusteeship having been established on May 1, 1971. The complaint alleges that the charges have not been remedied during the course of the trusteeship, but to the contrary have multiplied in that the trustee, defendant Field, appointed defendant Oliver to act as president and as his agent throughout the trusteeship, and that they have furthered and compounded the grievances resulting in the trusteeship. Plaintiffs charge that the continued existence of the trusteeship is in violation of Section 461 et seq. of 29 U. S.C. and is for the sole purpose of continuing in office those whom the trusteeship should have eliminated. Plaintiffs also aver that they were individual-

ly elected to the offices of the local and have sought to perform their duties, but have been unlawfully denied their right to do so by the actions of the defendants, and that the defendants, under the guise of the trusteeship, its cessation being long overdue, have usurped the powers, rights and privileges guaranteed to plaintiffs and other members of Local 795 by the constitution of the defendant International and the laws of the United States. In Count III of the complaint, plaintiffs charge that Oliver, individually and as agent of the trustee, in an effort to eliminate competition in union elections, illegally and in an undemocratic way sought to change the constitution and by-laws of the local union on July 7, 1973, a short while before an election of officers was scheduled to bring an end to the trusteeship.

For relief, plaintiffs, among other things, asked for a temporary order restraining defendants from interfering with plaintiffs' rights to hold office, for preliminary and permanent injunctive and declaratory relief dissolving the trusteeship, preserving union assets and records, declaring the election of October 6, 1973, valid, and for reimbursement of all salaries and expenses improperly incurred during the trusteeship.

At an early hearing, the Court denied plaintiffs' motion for a temporary restraining order and set the matter for a trial on the merits beginning January 15, 1974, meanwhile urging the parties to try to resolve their differences through union procedures. Prior to the scheduled hearing, the trustee, Local 795 and ILA filed a motion to dismiss on the grounds that plaintiffs had failed to exhaust their internal union remedies, and that plaintiffs were not proper parties in that their remedy is within the exclusive jurisdiction of the Secretary of Labor. In their answer, defendants admitted the jurisdiction of the Court under Title I but denied jurisdiction under Title III as to all allegations concerning the trusteeship, and, as to all allegations concerning the election (Title IV), again pled that the Secretary of Labor had exclusive authorization to initiate legal action. Affirmatively, defendants pled that a committee had been appointed to investigate plaintiffs' complaints, including the validity of the election of October 6, 1973, and to report its findings to ILA's President and Executive Council; and that it was conceivable that the report could contain findings and recommendations for relief equivalent to that sought by plaintiffs. Defendants amended their answer to plead that all plaintiffs' allegations pertaining to their denial of employment are exclusively within the jurisdicton of the National Labor Relations Board which had previously ruled against McDonald on such charges. Defendants further pled that the ILA investigation of the October 6, 1973, election shows that it should be set aside on the grounds that McDonald and E. J. Lebeau were not qualified nominees for elective office, ineligible members voted, and observers were not permitted to observe within the polls.

The hearing began as scheduled, with the Court finding that it had jurisdiction under Title I as it pertains to union members' voting rights and under Title III inasmuch as Section 464(a), 29 U.S. C., specifically provides that a member may bring an action under Title III. The Court heard numerous witnesses for plaintiffs and received documentary evidence before recessing the cause to June 11, 1974.

On March 25, 1974, the Secretary of Labor filed his action, styled and numbered above, against Local 795 and ILA, invoking jurisdiction under Title IV, Section 482(b), 29 U.S.C. The Secretary alleged that Michael J. McDonald, plaintiff in Cause No. 73S–263(R), and a member in good standing of Local 795, by a letter of October 22, 1973, addressed to Thomas W. Gleason, ILA president, protested the ILA's failure to install the officers duly elected on October 6, 1973; that Gleason acknowledged

McDonald's protest by letter of October 24, 1974, advising that an investigation of the matter would be made. On January 17, 1974, McDonald and others appealed from the findings of the committee appointed to investigate, and have invoked all available remedies without obtaining a final union decision within three months. Pursuant to Section 482(a)(2), 29 U.S.C., McDonald and others filed a complaint with the Secretary. Pursuant to 29 U.S.C., Section 521 and in accordance with 29 U.S.C., Section 482(b), the Secretary investigated and found probable cause to believe that Section 481(e) was violated in that the defendants denied members in good standing the right to hold office through defendants' failure to install the officers elected on October 6, 1973, and that said violation may have effected the outcome of the election. The Secretary, for a second cause of action relating to Title III, alleged that the ILA imposed trusteeship has continued far beyond its eighteen months' presumed validity; that by letter of February 16, 1973, members of the local had complained to the Secretary that the trusteeship should be dissolved; that the Secretary has investigated and found probable cause to believe that a violation of Title III has occurred and has not been remedied in that a continuation of the trusteeship is not necessary for a purpose allowable under Section 462, 29 U.S.C.

On April 29, 1974, the Court granted the motion of plaintiffs in Cause No. 73S–263(R) to consolidate the two actions, and denied defendants' motion to dismiss the private action on the grounds that the Secretary's action was exclusive. On April 30, 1973, the Court granted the Secretary's motion restraining defendants from conducting a new election scheduled by defendants for May 25, 1974, but denied the Secretary's motion for a preliminary injunction for the immediate installation of the officers who won at the October 6, 1973 elections until the Court had had an opportunity to hear all of the evidence.

In their answer to the Secretary's complaint, the defendants denied all material allegations and affirmatively pled that Local 795 is not a proper party defendant in that its authority has been superseded by the imposition of the trusteeship; that the Secretary has no authority under Title IV to seek the installation of officers; that as a result of protests filed to the validity of the election of October 6, 1973, said protests were investigated, and as a result ILA found that the election was invalid; ILA ordered the continuation of the trusteeship pending a new election; and that the Secretary and private plaintiffs were advised of these matters.

Following the January, 1974 hearing, this Court held additional hearings of several days each in June and July, 1974 until all parties had completed their evidence. Plaintiffs were allowed to amend their complaint by alleging that they had exhausted all union remedies prior to their charges of violations of Titles I, III and IV. The Secretary renewed his motion for an immediate installation of officers, and defendants renewed their motion to dismiss on the grounds that the Secretary has no authority to seek the installation of officers, his authority being limited only to the investigation of an election as to which protests have been filed. The Court reserved ruling on both motions. Meanwhile, defendants agreed to hold the new election they had ordered in abeyance pending this Court's decision.

■■■ The Court is persuaded that the private plaintiffs have exhausted their union remedies, to no avail, on their allegations and proof of violations of Titles I and III. There is evidence that numerous complaints were made of denials of job opportunities and the failure of defendants to recognize plaintiffs' voting rights by voiding the October 6, 1973, election, and to the continuance of the trusteeship. There is also evidence that during the trusteeship, complaints made directly to the ILA president were referred both to Field and Oliver for

disposition, the very persons against whom the complaints were made. It is accepted law that " . . . . where there is reason to believe that resort to an appeal within the union would be futile it is not necessary to follow such a course as a prerequisite to legal action." See *Libutti v. DiBrizzi,* D.C., 233 F. Supp. 924, wherein the above was quoted from *Farowitz v. Associated Musicians of Greater New York,* 2 Cir., 330 F.2d 999; also see *Calagaz v. Calhoon,* 5 Cir., 309 F.2d 248; and *Schonfeld v. Rafferty,* 2 Cir., 381 F.2d 446, affirming D.C., 271 F.Supp. 128. *Libutti* is also authority for private plaintiffs' contention under Title I that the voiding of the election by ILA and Field is an infringement of plaintiffs' rights as union members to nominate and vote for qualified candidates. Also, see *Mamula v. Local 1211,* D.C., 202 F.Supp. 348, rev. 3 Cir., 304 F.2d 108, wherein the lower Court said: "To bar a union member from holding office if nominated and elected is an unequivocal interference with rights of a union member, which must invoke the provisions of the Act as they relate to union members." This Court is aware of the holding in *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190, wherein the allegation of union members that eligibility requirements deprived them of the right to nominate candidates, was dismissed as not within the limited scope of Title I, and that this decision followed *Libutti* and *Mamula.* However, the allegations in the case sub judice are much broader in scope than the relief sought by individual plaintiffs in *Libutti, Mamula* and *Calhoon.* Here, although the named plaintiffs are officers claiming the right to be seated, they sue on behalf of not only themselves as union members, but on behalf of a majority of the union members whose votes were nullified by the actions of defendants. Further, defendants not only concede that the end of the trusteeship under Title III is overdue, but concede jurisdiction under Title I. All parties and the Court agree on the futility of dissolving the trusteeship until such time as there are properly elected officers to take over management of the union. The Court has no hesitancy, therefore, in finding that it has jurisdiction over the Title I and Title III allegations of both private plaintiffs and the government.

■ On the other hand, it is equally clear that private plaintiffs' rights under Title IV are within the exclusive authority of the Secretary to litigate except for the holding in *Trbovich v. Mine Workers,* 404 U.S. 528, 537, 92 S.Ct. 630, 30 L.Ed.2d 686. In that case involving a suit by the Secretary to set aside an election, and, where private plaintiffs sought to intervene in order to set forth additional grounds for voiding the election, Justice Marshall found nothing in the legislative history of Title IV or in the Act itself to bar intervention by a union member so long as his claims were limited to those presented by the Secretary. Therefore, if the Secretary has a right to his claim under Title IV, plaintiffs were properly allowed to amend their declaration in the consolidated suits by alleging the same grounds as the Secretary for relief under Title IV: that is, the installation of validly elected officers.

■ Although the Secretary in his Title IV count has not pled a run of the mill action challenging an election, he does maintain that defendants' action in voiding the election of October 6, 1973, is a violation of Title IV in that members in good standing (private plaintiffs), who were the winners of the election, have been denied the right to hold office contrary to the intent and meaning of Section 481(e), 29 U.S.C. The Court agrees. However, in order to do so, and before considering the evidence as presented, the Court finds that, if the election of October 6, 1973, was valid, then the setting aside of this election by the defendants and their ordering of a new election under conditions and qualifications set by the ILA and Local 795 may indeed "affect the outcome of an

election." See *Wirtz v. Teamsters Industrial & Allied Emp. U. Local No. 73,* D.C., 257 F.Supp. 784. The Court further finds that it is not required to order a new election, but, may, under Title I and its own inherent equity powers, validate the October, 1973 election if it in turn is found to have been valid.

The evidence in this case presents two sharply disputed issues: (1) whether or not plaintiff McDonald was an eligible candidate for office, and (2) whether the October 6, 1973 election was in all other respects valid. The Court has reviewed all of the testimony and exhibits and limits its findings to such evidence as pertains to these two issues, first giving a resume of the evidence leading up to the trusteeship and highlighting Field's testimony pertaining to the trusteeship.

In 1958 three separate trust funds were established and evidenced by agreements titled "Pension Plan and Trust," "Welfare Plan and Trust" and "Vacation Plan and Trust," executed by Local 795, whose membership is white, and Local 1303, International Longshoremen's Association, AFL–CIO, whose membership is black, on behalf of both union memberships, and by Ryan Stevedoring Company, and Walsh Stevedoring Company, Inc., the employers. These plans were established as provided for in collective bargaining agreements for the benefit of union members with all funds being contributed to by the employer. The plans provide for the appointment of four trustees with full management powers, one representing each local, and one representing each of the above employers and an administrator of the funds, the trustee's terms being for one year. In 1970, Sealand Terminal Corporation became an employer under the bargaining contract but, in the absence of representation on the Board of Trust-

ees of the plans, refused to contribute thereto. Instead, Special Account No. 051–863–8 was established in a local bank on which Harold C. Oliver[1] and Wilson Evans II, presidents of the locals and trustees of the plans, respectively, and Captain Thomas P. Toomey, a vice-president of Sealand, were authorized to withdraw funds. Rivalry between defendant Oliver and plaintiff, McDonald, as far as this record shows, began in November, 1970 when McDonald defeated Oliver in Local 795's election for trustee of the funds. At that time and until after the union trusteeship was imposed, Oliver, in addition to his salary as president of Local 795 and other emoluments, was paid the sum of $220.-00 per week to handle claims under the plans, plus expenses, as was also Evans, these amounts being paid from plan funds from October 1, 1970, until Field stopped this practice during the trusteeship. McDonald in his testimony said that after becoming a trustee of the plans he tried to find out, among other things, why the contributions of Sealand, then and now the largest contributor, were in a special account, drawing no interest,[2] and why some claims against the plans were not being processed. McDonald also admitted that he questioned some of Oliver's items of expense and refused to sign checks in payment of them. The affairs of the union reached such a stage in the latter part of 1970 that members of the union, including some of the plaintiffs here, directed a "Bill of Particulars," to the ILA Executive Council outlining lengthy charges against Oliver, a copy being in evidence as plaintiffs' Exhibit 4. On December 9, 1970, the same union members directed a request to Gleason, ILA president, asking him to invoke a trusteeship over Local 795. This request was accompanied by formal charges against Oliver registered with the local's record-

---

1. Oliver was elected president of Local 795 in 1962, continuing in that office until removed by Field in February, 1974.

2. Although McDonald had been elected a trustee, he apparently had no control over the special account, Oliver retaining his authority along with Evans and Toomey to make withdrawals.

ing secretary, with copies going to district and international officers, and was further accompanied by a list of 103 signatures of union members joining in the complaints against Oliver. Gleason informed Oliver of the charges and of a hearing to be held on the charges on January 21, 1971. As a result of these charges and the hearing, a trusteeship was invoked, effective May 1, 1971.

Fred R. Field, Jr., general organizer for ILA, was appointed trustee over Local 795 by ILA president Gleason. Field is also on the ILA executive council, holding many other offices at the district and international levels. As organizer, Field represents ILA along the eastern and southern shores of the United States, in Canada, South America, the Dominican Republic, Nassau, parts of South and Central America and Puerto Rico. He is president of the International Banana Handlers Council, controlling all local unions that handle bananas. He is a member of the ILA contract board which negotiates bargaining contracts throughout the country. He is a busy union man, and admittedly spent little time on the trusteeship in Gulfport. He testified at length. Inasmuch as plaintiffs and defendants admit that the end of the trusteeship is long overdue, it is unnecessary to detail his testimony concerning his service as trustee except to refer to pertinent admissions. He received no salary as trustee, but his expenses for his trips from his residence and office in New York City to Gulfport and return were borne by the local. Upon his appointment, he did not remove Oliver and the other local union officers from office, and admitted he was criticized heavily for his failure to do so. He directed Oliver to take charge of all union records, check books, receipt books, minutes, etc., to secure them, to change the locks of the union hall and allow no one in but Oliver and his secretary. He professed not to know how Oliver carried this out. He was familiar with the "bill of particulars" and other charges filed against Oliver heard by an ILA committee which recommended the trusteeship. As a member of the ILA executive council he voted for the trusteeship and was appointed as trustee by Gleason who instructed him to take possession of all of the local's records, remove such local officials as he deemed necessary, correct the trust fund abuses, and to remedy the charges against Oliver. Instead, he turned the records over to Oliver. He removed McDonald as trustee of the pension, welfare and vacation plans, as having "no clout" and substituted himself, admitting that he took McDonald's place to effectuate the changes McDonald was urging. He acknowledged that Oliver drank heavily and was in trouble with respect to the trust funds. He admitted that he did not instigate a union seniority plan until late 1973. He admitted that he had not attended a local union meeting during the trusteeship, his only attendance in Gulfport being at meetings of the trustees of the plans, and in negotiating bargaining contracts, and that he ultimately named Oliver as his alternate at the trustee meetings. He admitted that he sent Oliver to union meetings and conventions as an observer at the local's expense. He acknowledged that he knew in 1971 that the companies owed the trust plans over $500,000.00, and that in September, 1972 the amount had increased to $658,000.00, exclusive of the special account maintained by Sealand. He said that by virtue of the collective bargaining agreement of 1972 that Sealand became a party to it, and the special account was transferred to the union's trust funds. As of 1973, he was unaware of any sums due and owing the trust funds except for current obligations. He assumed the administrator of the funds would know, saying it was the duty of the administrator to collect the funds. He admitted that he had not advised litigation to collect any sums due and owing, and, as of the date of his testimony, he did not believe suit was necessary. He claimed credit for stopping the monthly payments from trust funds to Oliver and Wilson Evans for handling

claims, and he admitted he had raised Oliver's union salary from $325.00 to $375.00 a month, but thought it had been cut back. He admitted that the seniority plan had not been effected, but promised that it would be, and that it would be integrated with the black local union. He admitted that the charges by union members that they could not get work would have been solved with an effective seniority plan, and admitted that Local 795 through Oliver refused to cooperate. He admitted that in February, 1974 he formally removed all hold-over officers from office and appointed Oliver as his clerk under instructions to take orders only from Field himself. He admitted that he cancelled the installation of the officers elected in October, 1973. Of particular note, by originally retaining the same local officers, Field said he hoped that they could solve the local problems under his direction, but he admitted his plan had failed.

### McDonald's Eligibility for Office

A dispute arose during the trial as to which constitution and by-laws govern eligibility of union members to run for office. The local's 1959 constitution and by-laws contained no eligibility requirements for holding office, in the absence of which defendants concede that the ILA constitution and by-laws would prevail. That constitution and by-laws adopted at Miami Beach, Florida on July 19–22, 1971, approved by the Executive Council on February 11, 1972, provides in Article XIII that each local union shall elect by secret ballot among its members in good standing, a president, a vice-president, a recording secretary, a financial secretary or treasurer, an auditing committee, an executive board and such other officers and committees as the local union may deem necessary for the conduct of its affairs, for a term of two years. It further provides that subject to such other reasonable eligibility requirements as a local union may impose, no person shall be eligible for office unless he has been a member in good standing for at least one year preceding the date of his nomination and *working or seeking work*, at the trade or craft covered by such local union or employed by the local, except that the local union in its by-laws may provide for longer periods of eligibility up to but no more than three years. The preceding ILA constitution and by-laws of 1963 contained similar provisions. As stated above, the 1959 local's constitution and by-laws contained no eligibility requirements for holding office; nor did it provide for how long officers should serve. At the time of the trusteeship, the local union was operating under the 1959 constitution and by-laws. Terms of office were for three years, this apparently being provided for by the union's minutes or custom and practice. On June 28, 1973, Field, in a report of his trusteeship to the local union and its members, stated, among other things that he was arranging for printed copies of the May, 1972 bargaining agreement, the seniority plan, the debiting system for GAI Fund (not otherwise identified) and the constitution and by-laws of Local 795 to be mailed to very member. He also set up a schedule for a membership meeting on July 7, 1973, at which time the seniority plan would be explained; distribution of seniority cards on August 4, 1973; the implementation of the seniority plan by August 13, 1973; the nomination of officers on September 1, 1973; election of officers on October 6, 1973; and installation of officers on November 3, 1973. The evidence through numerous witnesses is that Oliver called for a membership meeting on July 7, 1973, not to explain a seniority plan as outlined in Field's letter, but for the membership to adopt a new constitution and by-laws—this with no prior notice and with no copies having been furnished the members. The proposed constitution and by-laws were read and moved for adoption with no questions or discussion allowed. According to the first vote, by a show of hands, passage failed. Oliver ordered a second vote, with members voting for passage on one side of the union hall,

and those opposed on the other side of the hall. On this vote, approval was declared. This undated constitution and by-laws, a copy being in evidence as plaintiffs' Exhibit 9, provides that no member shall be eligible for election to any office unless he has been a member in good standing for *at least three years*. Prior to the end of the trial, defendants conceded that this constitution and by-laws were void and ineffective inasmuch as such had not received the required approval of the ILA Executive Council. At the membership meeting of September 1, 1973, for the nomination of officers, a transcript of same being in evidence as defendants' Exhibit 17, although Oliver made no attempt to qualify or limit the nominees, it is of record herein and obvious to the Court that defendants, through Oliver and Field, used this means to discourage votes for McDonald in the ensuing election, and, when McDonald won anyhow, used McDonald's purported lack of qualifications as a protest following the election. Although McDonald's protest of Field's failure to install the winning candidates was acknowledged by Gleason, it is also clear to this Court that Gleason appointed a three-member committee to hold hearings in Gulfport during the month of January, 1974 on the basis of protests to the election engineered by Oliver and that this committee largely based its recommendation for a new election on its finding that McDonald was ineligible under the 1973 constitution and by-laws which defendants now admit was void. A transcript of this hearing is in evidence as defendants' Exhibit 30. As alleged in defendants' amended answer, cited above, the committee appointed by Gleason to hear protests to the election recommended that the election be set aside on the grounds that McDonald and LeBeau were not qualified to run for office, ineligible members voted, and observers were not permitted to observe within the polls. LeBeau's qualifications were challenged on the ground that he was alleged to be a supervisor in the employ of Sealand at the time of the election in violation of the 1973 ILA constitution and by-laws which prohibited his candidacy. In the Secretary's investigation dealt with later herein, this charge was found to be untrue, the Secretary's investigation having verified that LeBeau resigned from his supervisory position several weeks prior to the election.

As to the eligibility of McDonald, he testified that his job on the dock, that of a car sealer, was phased out in 1971. His testimony, supported by that of other plaintiffs' witnesses, was that thereafter, despite his reporting to the dock for "shape-ups," defendant Oliver, through threats made to the various foremen, saw to it that McDonald was "left on the hill," i. e., that he was not picked up on any gangs working at the docks. McDonald conceded that in 1972 and 1973 he was employed by the Board of Supervisors of Harrison County, Mississippi, in District Three, as a means of livelihood for himself and family, but that he nonetheless during the year prior to the October 6, 1973, election repeatedly reported to the docks and was refused work. He also stated that it was not unusual for members of the local to work on the dock and hold a job with the county. Defendants' witness, Leonard Winstead, a timekeeper for District Three, stated that McDonald was foreman of a work gang on county roads in 1972, paid by the month; that after the union election in October, 1973, McDonald was relieved of his job as foreman and assigned with another man to duty on county bridges where they could work out their own schedule. Winstead acknowledged that McDonald checked in with him in the mornings, usually by telephone, and thereafter Winstead did not necessarily know where McDonald was. He knew that McDonald previously had worked on the pier and said it was not unusual for county workers to also work on the pier. Raymond Bricknell, with 32 years' experience working on the pier and a member of Local 795, testified that he formerly was foreman of a gang; that McDonald was then working a heavy shift,

shoveling bauxite from the hold of ships; that Oliver requested him not to work McDonald, and when he, Bricknell, refused to fire McDonald, Bricknell's gang was laid off for five weeks. Ronald W. Foley, a member of Local 795 for 13 to 14 years, has been a foreman during 1971, 1972 and 1973. He testified that when McDonald's job as a car sealer was phased out, Oliver told the witness not to hire McDonald saying he, Oliver, did not want any foremen to hire McDonald. Thereafter Foley only hired McDonald in his gang when he was short of men. Foley said that Oliver named numerous others that he did not want Foley to give work to, being those who did not support Oliver, and that he, Foley, took Oliver's remarks as a threat to his own job, and that Oliver said he had more power under the trustee than when he was president. Since the election, Foley stated that men who did not support Oliver were laid off. Lawson Schmitt, a member of Local 795 for 12 years, is a head supervisor on the docks. He stated that Oliver had not directly told him not to hire McDonald, but that he got "the word" through Sealand's superintendent and assistant superintendent. It would make this opinion unnecessarily long to note the testimony of all plaintiffs' witnesses who said that McDonald did report for "shape-ups" at the dock and defendants' witnesses who said they had not seen him there. The Court does, however, note the testimony and conclusion of the Secretary's investigator.

Mr. Thomas W. Sutton, a compliance officer with the Department of Labor for 14 years, testified that he was assigned to investigate the trusteeship imposed on Local 795 and to investigate plaintiffs' protest that they were denied office after having won in the October, 1973 election. Sutton said he first came to Gulfport following a complaint of February 16, 1973, directed to the trusteeship. At the conclusion of his investi-

gation, no action was taken by the Secretary on ILA's representation of July 28, 1973, that the trusteeship would end following a new election. After plaintiffs' complaints to the Secretary of January 24 and February 6, 1974, that defendants had refused to install the winning candidates, Sutton immediately returned to Gulfport to investigate the circumstances surrounding the election. He went first to Oliver and conducted interviews with Oliver,[3] union members referred to him by Oliver, the newly elected officers and other union members. He specifically made himself available to any and all members. He examined ILA and local constitutions and by-laws. He relied on Oliver's statement that the 1959 local constitution and by-laws were in effect, but, as they contained no provisions for eligibility for office, Sutton concluded that the 1973 ILA constitution and by-laws would control.[4] With particular reference to McDonald's eligibility, Sutton determined from the receipt books that McDonald's dues were paid up to date and from his numerous interviews with union members that McDonald had indeed diligently sought work as a longshoreman within a year prior to his nomination as president and that he was eligible for nomination. The Court has considered all the testimony and evidence pertaining to McDonald's eligibility and agrees with the government's investigator that McDonald was for years a full time employee as a longshoreman on the docks; that in 1971 his permanent job was phased out; that thereafter he worked or sought work as a longshoreman; that defendant Oliver was primarily responsible for his lack of work; that McDonald, for a livelihood, was compelled to seek other work during the year prior to his nomination, notwithstanding which he still went to the docks during that period seeking work; that he was otherwise a member of the local

---

3. Oliver, through counsel, refused to give Sutton a written statement.

4. Oliver had by then been convinced by counsel that the July 7, 1973, constitution and by-laws were void.

union in good standing with paid up dues.

*Validity of the Election Otherwise*

In accordance with Field's time schedule, and a separate letter of August 15, 1973, from Field to the local membership both in evidence, a meeting was called for September 1, 1973, for the purpose of nominating candidates for the election to be held on October 6, 1973. Candidates were nominated as reflected by minutes of the recording secretary, Richard Clark, government's Exhibit 3, and by a transcript of the meeting, defendants' Exhibit 17. As reflected by the latter, Oliver announced that each candidate would receive a list of eligible voters prepared by Charles Logan, Richard Clark and Mrs. Bradley,[5] and that an ILA committee would pass on the candidate's qualifications. Oliver temporarily turned the meeting over to Monroe Kimball, chairman of the election committee, who identified other members of the committee, all appointed by Oliver, and Kimball read the voting rules adopted by the committee, a copy of which is in evidence as plaintiffs' Exhibit 16. One of these rules provided that only members in good standing as of September 1, 1973, would be qualified to vote. Another provided that each candidate would be allowed one poll attendant, the attendant to be seated during the counting of the vote. Oliver testified that customarily the recording secretary compiled a list of the members eligible to vote, after checking same against dues receipts. Clark testified that he attempted to prepare such a list as best he could because Oliver had taken all his records and had them locked up. Oliver at first denied this and later, when on the stand for the second time, admitted that he had deprived Clark of the records except for one day, September 1, 1973. A copy of the list prepared by Clark, defendants' Exhibit 8, listing 374 members, was handed out by Oliver to each candidate several days prior to the election. Oliver also testified that he was instructed by Field to have the accountant prepare a list, defendants' Exhibit 9. This list, dated September 28, 1973, was not furnished the candidates, but was used in the election. It contains 375 names, the first name, that of Thomas Achee, not having been on Clark's list; otherwise the names are identical. On his list, the accountant noted 12 members receiving retirement benefits who paid no dues, 23 members who were listed by the local as injured, and who were behind in the payment of dues, and 10 otherwise active members whose dues were not paid. He also placed asterisks by the names of 53 members whose dues were not deposited until September 24, 1973. Clark testified at length as to this last group saying that these were members who paid their dues to him during August, 1973, either at the union hall or while he was at home recuperating from hospitalization, at a time when he was denied use of the dues receipt books by Oliver; that he made notes of those who paid and ultimately deposited the funds in the union account as was recognized by the accountant. There is no dispute among any of the witnesses that retirees had always voted without payment of dues and that they were eligible. At the time the election committee met on September 22, 1973, the committee having before it Clark's list, and its own minutes, government's Exhibit 4, reflect that the committee agreed that all retired members could vote. As to those on the injured list, the committee chairman, Kimball, defendants' witness, testified that there were more of these names than usual, and, in an attempt to be fair, the committee, as shown by the minutes, determined that the injured members would be notified by registered mail that they would have until September 28, 1973, to bring their dues up to date. For all others the cut-off date would be September 1, 1973. Kimball

---

5. Elsewhere in this case, Logan has been identified as the Certified Public Accountant regularly employed by the local union, Richard Clark as recording-secretary, and Mrs. Bradley as the office secretary.

testified that the committee felt that if it was wrong in allowing injured members to pay by September 28, 1973, and thereby be eligible to vote, then the ILA officials who were to conduct the election could say so. This committee also noted in its minutes that Thomas Achee should have been included as an eligible voter, as he was on the accountant's list.

Despite Oliver's promises that an ILA committee would pass on the candidates' qualifications before the election, two executive board members, one retired, of the South Atlantic & Gulf Coast District of ILA were instructed to observe the election. Both testified, being Ewell St. Amant, a former president of an ILA local union in New Orleans, Louisiana, as well as a former member of the district executive board, with previous experience in observing union elections, and E. R. Dennies, who succeeded him in both offices. They arrived in Gulfport early before the election and met with the election committee, the nominees and members. St. Amant said that he asked if there were any objections to the accountant's voter list and there were none. He received no protests during the election or afterwards, saying that he received numerous compliments that the election was fair in every respect. He confirmed that the candidate's attendants or observers were asked to leave the hall during the voting, but that all were invited in for the counting in accordance with the election committee's voting rules. None protested. He and Dennies reported the winning candidates to Oliver and to the president of the district council, Ralph A. Massey, who had instructed them to observe the election. Dennies, also with experience in observing elections, said he was furnished the accountant's eligibility list and the election committee's rules. The committee chairman, because there were so many observers, asked Dennies to remove the observers from the polling area and he did. The observers were present for the counting. He admitted that some voters protested the removal, but none of the candidates did. There were two challenged ballots which were sealed and remained in his possession still sealed until he returned them to Oliver in Gulfport. He had never seen Field and thought Oliver was the trustee.

Sutton, the government investigator, testified as to his investigation of the election. In addition to examining the various constitutions and by-laws as to which he said Oliver told him the local's constitution and by-laws adopted in July, 1973 controlled and later admitted they did not, Sutton called upon Oliver for all records pertaining to the election. They were locked in the ballot box which had to be broken open, no one apparently having a key, including Oliver. Sutton said that 400 ballots were printed, and of the 375 names on the accountant's list, 319 ballots were counted, 2 were challenged, and 79 were unused. He compared Clark's voter eligibility list with that of the accountant and found only the omission of the name of Achee from Clark's list. He said the 1959 local constitution and by-laws contained no provision as to the eligibility of retirees, sick and injured to vote, but he confirmed that retirees customarily had been allowed to vote. He compared the accountant's eligibility list with the list of voters receiving ballots, defendants' Exhibit 10, and said of the 12 retirees, 9 voted. Of the 23 on the injured list, 8 responded to the notice of the election committee by paying their dues, 7 of these casting ballots. He interviewed Richard Clark at length, checking late deposits against dues receipts, and satisfying himself that all deposits after September 1, 1973, represented dues paid before that date. In the records Sutton examined were the two challenged votes, still sealed. By comparing the numbers on the outside of the envelopes with the same numbers on the list of those who received ballots, he determined the identity of those casting the challenged ballots. He interviewed both and subsequently found that one was eligible to vote and the other not. He stated that the eligible vote would not have changed the election of any officer.

Sutton in the presence of Oliver, Oliver's attorney, McDonald and several other union members re-counted the ballots. The totals shown as added to Richard Clark's minutes of the meeting when candidates were nominated, as compared with Sutton's re-count, showed different totals in some instances, but in no case did the variance change the result of the election. The results according to Clark's tabulations and those of Sutton's re-count are shown in the following columns:

| | Clark's Minutes | Sutton's Re-count |
|---|---|---|
| President | | |
| Harold Oliver | 115 | 115 |
| * Michael McDonald | 136 | 136 |
| E. J. LeBeau | 66 | 66 |
| A. A. (Ace) Cunningham | 2 | 2 |
| Vice President: | | |
| Ed Scarborough | 83 | 82 |
| Ivy P. Hebert | 17 | 17 |
| Ronald H. Bentz | 51 | 52 |
| * Eugene Ladner | 115 | 116 |
| Herman Clark | 47 | 49 |
| Secretary-Treasurer: | | |
| Paul E. Bergeron | 70 | 70 |
| Rudolph Tillman | 113 | 113 |
| * Norman J. Ladner | 115 | 115 |
| Lewis Garlotte, Jr. | 17 | 19 |
| # Chris Hyden | | 1 |
| Recording Secretary: | | |
| * Richard Clark | 212 | 212 |
| Everett Necaise | 100 | 100 |
| # Chris Hyden | | 1 |
| Sergeant-at-Arms: | | |
| Ed C. (Jack) Perrone | 94 | 94 |
| Dale Paige | 72 | 92 |
| * Tony Lamberg | 108 | 124 |
| Trustees (Three) [6] | | |
| Raymond Lizana | 91 | 91 |
| Felix Brown | 27 | 27 |
| Fred T. Ladner | 68 | 68 |
| * Elmer Ford | 109 | 109 |
| Lynn E. Bangs | 87 | 87 |
| Ronald (Dinky) Davion | 59 | 58 |
| Homer (Gobbler) Vogle | 93 | 95 |
| John (Hamhock) Coleman | 51 | 50 |
| E. N. Welch | 32 | 32 |
| * Bernie Ray Saucier | 101 | 101 |
| * Eugene Niolet | 151 | 151 |
| E. J. LeBeau (withdrew) | | |

* Indicates winners.
# Was not nominated but had a vote cast for him.

From the various interviews with and statements taken from union members who supported Oliver and those who supported McDonald, Sutton found that no protests were made about observers being asked to leave the voting area during the balloting until well after the votes had been counted, when observers were present. He acknowledged that the removal during voting may have been a technical violation of the Labor-Management Reporting and Disclosure Act, but that such did not affect the tally. All were asked to leave indiscriminately, and none protested before the election. Sutton stated that Field said it was customary for retirees and the disabled to vote without paying any dues, and, in any case, Sutton found that the seven votes cast by those on the injured list would not have changed McDonald's victory over Oliver.

The Court has carefully reviewed all the live and documentary evidence concerning the election, and finds that Michael McDonald was an eligible candidate. His dues were paid up, and the evidence was convincing that within a year of his nomination he had sought work in the trade despite Oliver's successful attempts to block his employment. The Court finds that the finding by the ILA executive committee which met in Gulfport on January 9, 1973, that McDonald was not eligible, if based on the qualifications set out in the subsequently admitted, void, local constitution and by-laws of 1973, was in error. This committee's finding that LeBeau was a supervisory employee and therefore ineligible was also in error, as evidence before this Court shows that he resigned his supervisory job weeks before the nominations. The Court further finds that defendants' objections to the election on the grounds that observers were not allowed in the voting area while the voting was taking place, and the fact that seven members on the injured list, whose dues were not paid until September 28, 1973, were allowed to vote, are not well founded. The seating of the observers during the counting of the

6. These trustees are the executive board of the local and are not the trustees of the three trust plans, whose election is separate, or supposed to be.

ballots was in full compliance with the voting rules which were read to the membership meeting of September 1, 1973. No objection was made thereto until after the voting took place on October 6, 1973. The Court finds that the rule was exercised indiscriminatorily and did not affect the outcome of the election. The Court finds that the action of the election committee in giving those on the injured list extra time in which to pay their dues before the election was known to Oliver and other candidates, none of whom made any objection thereto, and was in reality a concerned effort on the part of the election committee to have a fair election; and further finds that the seven who voted, even if their ballots were cast for a losing candidate, could have affected no office but that of secretary-treasurer and sergeant-at-arms, the losers of which made no objection appearing in this record. There is a stipulation of record that, as to the election of Norman J. Ladner, elected Secretary-Treasurer, Tony Lamberg, elected Sergeant-at-Arms, and Elmer Ford, elected trustee, there were no protests at all.

The Court has given due consideration to defendants' alternative request for a new election conducted under the auspices of the Secretary of Labor, and finds that such would now be fraught with obstacles in determining of voter eligibility in a new election, and would clearly be prejudicial to the candidates who won in the October 6, 1973, election.

The Court therefore validates the election of October 6, 1973 and directs that the winning candidates be forthwith installed. The Court specially finds that the 1973 ILA constitution and by-laws applied to the election, and therefore the terms of office should be, and are hereby found to be, for two years, said terms to have commenced running from October 6, 1973. The Court finds that the continuation of the trusteeship is no longer warranted and directs that it cease upon the installation of the duly elected officers heretofore listed, and that defendant, Field, and defendant, Oliver, forthwith turn over all local union property in their possession to the appropriate officers whose election is herein validated. This permanent injunctive relief is directed to and binding on all named defendants, their officers, agents, servants, employees and attorneys.

Although there was abundant evidence that Oliver received illegal weekly remuneration from the pension, welfare and vacation funds until Field put a stop to it, plaintiffs have not furnished the Court with adequate proof of identifiable amounts. Although his convention and automobile expenses paid by the local union may have been exhorbitant, there is no evidence upon which the Court can distinguish reasonable items from unreasonable, besides which, Field, as trustee, had authority to order these expenses paid. Accordingly, the Court assesses no damages against Oliver, Field or the local union, the latter of which has already paid these expenses. It would be a futile gesture to direct the local union to pay again what it has already paid.

The Court reserves ruling at this time on an allowance of plaintiffs' attorney fees, primarily for the reason that there is no evidence presently before the Court as to any sums plaintiffs may already have paid their counsel.

With this one reservation, the Court considers this opinion and the order to be entered herein final for purposes of appeal.

An appropriate order may be submitted incorporating this opinion by reference, with costs assessed to the defendants.