Herman REKANT

v.

SHOCHTAY–GASOS UNION LOCAL 446
OF the AMALGAMATED MEAT CUT-
TERS AND BUTCHER WORKMEN
OF NORTH AMERICA, Appellant.

No. 14110.

United States Court of Appeals
Third Circuit.

Argued Feb. 20, 1963.

Decided June 21, 1963.

Edward Davis, Philadelphia, Pa., for appellant.

Henry B. FitzPatrick, Jr., Philadelphia, Pa. (Broderick, Schubert & FitzPatrick, Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN and GANEY, Circuit Judges, and COHEN, District Judge.

McLAUGHLIN, Circuit Judge.

Appellant appeals from the judgment of the district court finding that it had violated Section 101(a) (5) of the Labor-Management Reporting and Disclosure Act of 1959 [1] (LMRDA) and awarding nominal damages in favor of appellee.

Appellant is a labor union affiliated with the Amalgamated Meat Cutters and Butcher Workmen of North America. It has approximately twenty-three members, all of whom are shochtim (kosher slaughterers) who work in the handful of Philadelphia meat packing firms that slaughter meat in accordance with the laws of the Jewish religion. Appellee, a member of this union, had been employed as a cattle shochet in a small slaughter house when, in November of 1959, his employer went out of business, leaving him with no job. Subsequently, appellee appeared at an executive board meeting of the union on November 22 and "requested for a job", evidently believing that he had a "right" to be given work. At any rate, there is evidence of a past practice of making available temporary replacement work to a union member in a situation similar to that of appellee. The replacement work is arranged by the members of the union giving up, in turn, a day's work to their less fortunate colleague; the number of days of replacement work per week may vary, depending on such factors as his need and the strength of the job market. The replacement is paid for his day's work by the man whose job he has taken. The union's president testified that such work arrangements are temporary, stop-gap measures designed for a "short time to help out and then the situations straightened itself out by itself"—i. e., the member secures permanent employment.

At the meeting of November 22 the cases of appellee and another unemployed member were considered by the executive board and after much heated debate appellee's request was granted. A resolution was adopted obligating the shochtim members to give up a total of three days of work per week to appellee. [2] The president, Rabinowitz, had the responsibility of selecting those who would give their work day for appellee. The following week, at a general meeting of the union, a resolution was proposed to withdraw the November 22nd resolution for failure of appellee to appear at work punctually and otherwise satisfactorily perform his duties. Although this recommendation was fully discussed, no vote was taken because appellee was not present. Accordingly, at a later general meeting on February 1, 1960, at which appellee was present, the matter was again debated and a resolution rescinding the November 22 one was adopted. [3]

Appellant does not contest the fact that it did not give appellee written specific charges or any time to prepare

1. 73 Stat. 523, 29 U.S.C. § 411(a) (5) (1959).

2. The minutes of the meeting, as translated from the Yiddish, read:
"Brother Rekant was called in, and Brother Schachter transmitted in a few words that which had transpired and says to him that all of the shochtim members have voluntarily or willingly decided to get or create three days' work for him in the slaughtering houses. This they do. not because they want to and think that he is entitled thereto, only out of pity, and they voluntarily decide to give him another opportunity to see whether he can perform the work. Brother Rekant then answered, and again there ensued heated words, and the president closed the meeting."

3. "Mr. Miller now speaks. All of the minutes are full of Rekant. He wants work, and at a time when he can't do the work. Various plans have been worked out through this union in order to give him the opportunity to learn the work, but immediately he would say that he already knows it. But the truth is he himself tells that he does not know the work. We don't have a school where he can learn it. Therefore, he proposes that a resolution of the executives to give him two or three days' work a week should be withdrawn. Also, the resolution shall be withdrawn because of his constant unfriendly attitude to the union and because of his untrustworthiness, unfriendly conduct. It was decided to take Mr. Miller's motion to a secret ballot."

his defense to the proposed union action at the February meeting.

Appellee's claim against his union is framed on the sole, narrow question of whether the rescinding resolution of February 1, 1960 constituted disciplinary action by a union within the meaning of Section 101(a) (5)[4] and thus was a denial of the rights guaranteed to him by this section because effected without written specific charges and a reasonable time for preparation of a defense. The court below held that appellee had been "disciplined" in violation of his Title I rights,[5] declared the February resolution null and void and awarded nominal damages to appellee.

The main argument pressed by appellant is that the jurisdiction of the district court was preempted by the jurisdiction of the National Labor Relations Board (Board). Appellant submits that what appellee has alleged and testified to in this case amounts to an unfair labor practice, or at the very least is "arguably" subject to the provisions of the Labor Management Relations Act (Taft-Hartley)[6] and thus under the line of cases starting with San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) exclusive primary jurisdiction is in the Board.

Appellant points to the fact that, prior to instituting the present suit, appellee filed unfair labor practice charges with the Board alleging violation of 8(b) (1) and (b) (2).[7] The Regional Director refused to issue a complaint because there was "insufficient evidence" of violation of the Act, and that decision was affirmed on the appeal to the General Counsel.

It is not necessary to detail the other objections which appellant raises to this phase of the district court's opinion, for its initial premise that the substance of the charges before the Board and the district court is identical is erroneous. Appellee's complaint to the Board was twofold.[8] First, he alleged that by virtue of the "hiring hall type arrangements" *which the union has with the slaughter houses* the union is able to control his employment; this arrangement with the employers "amounts to more than mere coercion of employers to discriminate in their hiring practices against one who is out of favor of the union officers—because of the hiring hall type arrangements it is absolute assurance that such discrimination will result"; the rescinding resolution of February 1, 1960 is a manifestation of his "falling out" with the union and consequent denial of work. Second, appellee

4. Section 101(a) (5), 29 U.S.C. § 411(a) (5) provides:
"No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."
By Section 102, 29 U.S.C. § 412:
"Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. * * *"

5. Appellee's complaint alleged a violation of subsections (A), (B) and (C) of Section 101(a) (5). The district court held for him on (A) and (B) but not on (C).

6. 61 Stat. 144 (1947), 29 U.S.C. § 158(b) (1), (2) (1958).

7. So far as pertinent, these sections (29 U.S.C. §§ 158(b) (1) and (b) (2)) provide that it is an unfair labor practice for a Union:
"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 * * *."
"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *."

8. The charges with the Board were filed by appellee himself, for he says that he did not have counsel at this stage. He was represented by his present counsel on the appeal from the decision of the Regional Director. The exposition of his charges set out above is taken from the letter of counsel to the Board's General Counsel requesting a review of that decision and explains in more detail the substance of appellee's claims.

charged that "the Union practice of hiring and of buying and selling jobs constitutes an unfair labor practice," for the senior shochet [9] "in any given slaughter house completely controls the lot of the junior shochtim [appellee]" and "his control is not modified or inhibited" by the existence of any federal labor legislation or the collective bargaining agreement in effect between the union and the slaughter house.

It is readily apparent that these charges are totally different from the conduct complained of here and they do not present the problem of a possible conflict between the exercise of Board jurisdiction and that of the district court. As we noted at the outset, we are concerned with the narrow question of whether appellee has been "disciplined" by his union within the meaning of Section 101 (a) (5). In this posture of the case we need not reach the broader claims of employer-union discrimination and illegal union activity raised before the Board. And by the express terms of Section 102, 29 U.S.C. § 412, "[a]ny person whose rights secured by * * * this subchapter have been infringed by any violation of [Section 101(a) (5) ] may bring a civil action in a district court * * * for such relief (including injunctions) as may be appropriate."

■ Even assuming that there might be elements of this case arguably subject to Sections 7 or 8 of the Taft-Hartley Act affords no basis for ousting the jurisdiction of the district court. A similar argument was presented to the Supreme Court in Int'l Assn. of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed. 2d 1018 (1958), where a former union member, allegedly expelled from his union in violation of his rights under the union constitution and by-laws, sued in a state court for reinstatement and damages. The case was brought to the Supreme Court on the question of whether exclusive jurisdiction in this type of case was in the Board. The Court stated, 356 U.S. at 619–620, 78 S.Ct. at 924–925:

"Since we deal with implications to be drawn from the Taft-Hartley Act for the avoidance of conflicts between enforcement of federal policy by the National Labor Relations Board and the exertion of state power, it might be abstractly justifiable, as a matter of wooden logic, to suggest that an action in a state court by a member of a union for restoration of his membership rights is precluded. In such a suit there may be imbedded circumstances that could constitute an unfair labor practice under § 8(b) (2) of the Act. In the judgment of the Board, expulsion from a union, taken in connection with other circumstances established in a particular case, might constitute an attempt to cause an employer to 'discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *' 61 Stat. 141, 29 U.S.C. § 158(b) (2). But the protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been undertaken by federal law, and indeed the assertion of any such power has been expressly denied * * *. Thus, to preclude a state court from exerting its traditional jurisdiction to determine and enforce the rights of union membership would in many cases leave an unjustly ousted member without remedy for the restoration of his im-

9. In describing the senior shochtim the court below stated:
"The senior shochtim seem to have a kind of ownership in their job rights with a particular slaughter house, which permits them to select the junior shochtim who are to work with them. The senior shochtim's 'rights' apparently are the subject of informal transfer and sale, somewhat like incorporeal hereditaments." 205 F.Supp. at 286.

portant union rights. Such a drastic result, on the remote possibility of some entanglement with the Board's enforcement of the national policy, would require a more compelling indication of congressional will than can be found in the interstices of the Taft-Hartley Act."

Congress, in enacting Section 102, has now expressly provided for the federal protection and enforcement of a union member's right to be free from certain arbitrary conduct of his union.[10] The explicit Congressional declaration and the reasoning, in an analogous situation, of the Supreme Court in Gonzales, establish that the district court is competent to retain jurisdiction of a Section 101(a) (5) suit even when elements of the case are arguably subject to the Board's jurisdiction. "The fact that the Act preserves to union members all remedies 'under any State or Federal law or before any court or other tribunal * * *,' § 103 of the LMRDA, 29 U.S.C. § 413 * * * only means that the new federal protection was superimposed on protection already available in other forums, 'reinforcing and not supplanting it.' Summers, 'The Law of Union Discipline: What the Courts do in Fact,' 70 Yale L.J. 175, 176 (1960)." Parks v. International Brotherhood of Electrical Workers, 314 F.2d 886, 922 (4 Cir. 1963).

Appellant's reliance on the cases of Rinker v. Local Union No. 24 of Amalgamated Lithographers of Am., 201 F. Supp. 204 (W.D.Pa.1962), and Baker v. Shopmen's Local, 403 Pa. 31, 168 A. 2d 340 (1961) is misplaced. In Rinker, the plaintiff union member filed a complaint in two counts. In the first count, directed against the union, he alleged that he was expelled from union membership in violation of the procedural safeguards of Section 101(a) (5). The second count, directed against both the union and his employer, alleged that by virtue of a conspiracy between the defendants he was fired from his job. It was precisely because of the failure of the district court to adjudicate the parties' rights and liabilities under count one, that this court dismissed plaintiff's appeal from the district court's determination as to the second count. Rinker v. Local Union No. 24 of Amalgamated Lithographers, 313 F.2d 956. (3 Cir. 1963). The language in the district court's opinion which appellant relies on is in reference to the employer-union conspiracy charge and has no application to plaintiff's, as yet undetermined, claim under Section 101(a) (5). The Baker case is similarly inapplicable, for the complaint therein was also of an employer-union conspiracy to discriminate against certain union members and no rights were asserted under Section 102 of the LMRDA.

Appellant next contends that its action in rescinding the resolution to share work with appellee did not constitute "discipline" within the meaning of the phrase "or otherwise disciplined" of Section 101(a) (5). Admittedly, appellee does not come within the "fined, suspended, expelled" provision of Section 101(a) (5). The question, therefore, is whether appellee has been "otherwise disciplined;" specifically, whether the rescinding resolution affected appellee in the status of his union-member relationship so as to make such action subject to the protective provisions of Title I of the LMRDA. Tomko v. Hilbert, 288 F. 2d 625, 629 (3 Cir. 1961).

By the union resolution of November 22, 1959 appellee was given the right and opportunity (subject to a corresponding duty on him to perform to the satisfaction of his fellow workers and employers) to have three days of work a week made available to him as a replacement for one of the other members. Appellee urges, and the lower court held, that the rescinding resolution effectively cut off this work source and thus constituted "discipline".

---

10. See Robertson v. Banana Handlers, etc., 183 F.Supp. 423 (E.D.La.1960); Detroy v. Am. Guild of Variety Artists, 286 F.2d 75, 78 (2 Cir. 1960), cert. den., 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); Parks v. International Brotherhood of Electrical Workers, 314 F. 2d 886, 922 (4 Cir. 1963).

Appellant directs a two pronged attack on this position. First, it urges that this action had no relation to appellee's protected Section 101(a) (5) status because the union did not fine, suspend or expel him and he is acknowledgly a member in good standing in the sense that his dues are paid up to date. Accordingly, appellant contends that "the conduct of which he [appellee] has complained deals exclusively with alleged interference with his employment and seniority rights" and "at no time has the *status* of plaintiff as member of defendant Union ever been changed or altered" by any action of the union. We cannot agree with the position that this action did not touch and concern the union-member relationship, for the evidence demonstrates plainly the central fact that the group sanction directed against appellee went to the heart of this relationship.

The minutes of the union meetings and the trial testimony show that, in the eyes of at least a majority of the union's members, appellee's conduct, inter alia, reflected badly on the union and was disruptive of its internal harmony: not only did he allegedly let his colleagues down by his conduct but his performance was so totally unsatisfactory to the supervisory employer for whom he worked his first and sole day pursuant to the work-sharing plan that it provoked vigorous complaints from this employer which were directed to several of appellee's union members in the form of requests to take appellee off the job. The basic thrust of the union action—prompted as it was by appellee's behavior as a member of Shochtay-Gasos Local 446—looked towards stopping appellee's present behavior and preventing or curtailing its possible repetition.

 This brings us to the more fundamental question of whether the union action in rescinding its resolution, although directed to the union-membership relationship, was effective so as to constitute Section 101(a) (5) "discipline". Appellant contends that under the reasoning of the court below appellee could not have

been disciplined. Its argument is based on the later portion of the opinion dealing with appellee's claim for damages, wherein the court states, 205 F.Supp. at 292:

"It is very clear from the record that plaintiff was * * * an unsatisfactory employee * * * [H]is own testimony justifies the conclusion that he is not competent to perform some of the more difficult work of a shochet * * * On a number of occasions when work was offered to him, he refused to take it. The record of his employment has more than one instance of loss of work for alleged incompetence or unsatisfactory performance. *It is clear beyond substantial dispute that his work was not satifactory to his employers.*

"We are led to the conclusion * * * that * * * *he would not have obtained any work beyond what was offered to him, even if the rescinding resolution had not been adopted. He would not have obtained it because his potential employers would not have accepted him as their employee* * * * Hence we award him only nominal damages." (Emphasis supplied.)

Since the court has held that, due to his incompetence and unsatisfactory behavior, no employer would have hired appellee whether or not the resolution had been rescinded, appellant submits that it "has not punished or brought retribution upon" appellee in any way.

It might be argued that appellant's position rests on dictum extracted from that portion of the court's opinion dealing with appellee's claim for damages. The court's holding on this phase of the case was that, since appellee claimed damages, he had the burden of showing that there was work available to him— i. e., that some employers would not have objected to his being a replacement for one of the regular men—and that he could have satisfactorily performed it but for the rescinding resolution. Having

**277**

failed to sustain his burden on this claim appellee was only entitled to nominal damages.

The quoted portion of the court's opinion, however, is more than the mere necessary finding of fact that appellee failed to bring forth evidence as to available jobs. It goes far beyond this and cannot be disregarded as mere surplusage. It is an express finding of fact, solidly rooted in the evidence, that has primary relevance to the court's earlier holding with respect to the "disciplinary" effect of the rescinding resolution. This finding of fact renders the rescinding resolution meaningless: the resolution did not "close the door" to employment previously opened by the union's share-work resolution, for appellee had already closed that door himself by (1) either refusing to take work offered to him or (2) compiling a steady record of unsatisfactory performance when he was on the job and thereby alienating his employers and fellow workers.

Viewing the rescinding resolution in the light of its actual effect on appellee we find, contrary to the court below, that he was not "otherwise disciplined" within the meaning of Section 101(a) (5). At most, the rescinding resolution was an implied and indirect reprimand or censure of appellee for his behavior. Such a mere "slap on the wrist" cannot be raised to the level of a "fine, suspension, or expulsion" or an action of similar severity embraced by the "otherwise disciplined" proviso. Congress entered the delicate field of internal union affairs, over the strenuous objections of leading experts in the field of labor legislation,[11]

primarily because of the stimulus provided by the highly publicized McClellan Committee disclosures of grave abuse in this area. The union action before us now certainly was not within the intended scope of such legislation.[12]

We have considered the other arguments advanced by appellant but none of them constitutes grounds for reversal. In view of our holding on the issue of Section 101(a) (5) discipline, there is no need to examine these points in detail.

The judgment of the district court will be reversed.

---

11. For a summary of the leading objectors to the proposed "bill-of-rights" legislation see Hickey, The Bill of Rights of Union Members, 48 Georgetown L.J. 226, 227–239 (1959).

12. The factual situation here is unlike that in Detroy v. Am. Guild of Variety Artists, 286 F.2d 75 (2 Cir. 1960), cert. den. 366 U.S. 929, 81 S.Ct. 1650, 6 L. Ed.2d 388 (1961) where the union member "blacklisted" by his union was effectively denied employment and thereby "disciplined" within the meaning of the

Act. The same may be said for Gross v. Kennedy, 183 F.Supp. 750 (S.D.N.Y. 1960) where the union's removal of a member from his job as a grocery store clerk was held to be "discipline". See also Deluhery v. Marine Cooks and Stewards Union, AFL-CIO, 199 F.Supp. 270, 273 (S.D.Calif.1961) where a union "Trial Committee's" recommendation of expulsion was held to be within the category of "otherwise disciplined" so as to withstand defendant union's 12(b) (6) motion (FRCP).