Michael J. McDONALD et al.,
Plaintiffs-Appellees,

v.

Harold OLIVER et al.,
Defendants-Appellants.

John T. DUNLOP, Secretary of Labor,
U. S. Department of Labor,
Plaintiff-Appellee,

v.

LOCAL UNION 795, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, et al., Defendants.

No. 74–3731.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1976.

---

**1220**

C. T. Sykes, Jr., Gulfport, Miss., Thomas W. Gleason, Herzl S. Eisenstadt, New York City, Victor H. Hess, Jr., New Orleans, La., for defendants-appellants.

Alben N. Hopkins, Gulfport, Miss., for McDonald.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., for Brennan.

George Palmer, U. S. Dept. of Labor, Birmingham, Ala., William Kanter, Barbara L. Herwig, Paul Blankenstein, App. Sec., Civ. Div., Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

Before GEWIN, COLEMAN and GEE, Circuit Judges.

COLEMAN, Circuit Judge.

The various defendants appeal the judgment of the District Court, rendered under Titles I, III, and IV of the Labor Management Reporting Disclosure Act of 1959, 29 U.S.C. Sections 401, et seq.,[1]

---

1.

Title I

This is the "Bill of Rights" for union members, establishing certain basic democratic principles which must be adhered to by labor organizations.

Title 29 U.S.C. § 411 guarantees equal voting and participation rights, freedom of speech and assembly, freedom from improper assessments, protection of the right to sue, and safeguards against improper disciplinary action.

mandatorily enjoining compliance with the results of a union election in which the plaintiffs were chosen to be officers of Local 795 of the International Longshoremen's Association, dissolving a trusteeship over that Local, enjoining defendants from declaring McDonald ineligible for Local office, enjoining further violations of Title III, and awarding both back pay and attorney fees, *McDonald v. Oliver*, 400 F.Supp. 660 (S.D.Miss.1974).

Appellees cross appeal, asserting inadequacy of the awarded attorney fees and challenging the two year length of the term of office prescribed by the District Court.

Except as to that portion of the appeal which has been rendered moot, the Judgment of the District Court is affirmed on both direct and cross appeals.

## Facts of the Case

Local 795 is one of two branches of the International Longshoremen's Association (ILA) operating in the Gulfport, Mississippi area. Internal dissension in the Local reached a peak in 1970, during

---

The remedial provision for violation of these rights appears in § 412, which reads as follows:

> Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

> \* \* \* \* \* \*

Section 411(a)(4) further provides that a member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within the union before instituting legal proceedings.

Title III

Title III of the Act, 29 U.S.C. § 462, provides for the imposition of a trusteeship by the international over a local to correct corruption or financial malpractice, assure performance of collective bargaining agreements, restore democratic procedures, or otherwise carry out the legitimate objects of the labor organization. Section 464 establishes a presumption that a trusteeship invoked in conformity with the union's procedural requirements and ratified after a fair hearing by the executive board is valid for 18 months. After that period it is presumed invalid and its discontinuance will be decreed unless the labor organization shows by clear and convincing proof that its continuation is necessary for one of the above purposes.

Section 464(a) establishes the following civil action for enforcement:

> (a) Upon the written complaint of any member or subordinate body of a labor organization alleging that such organization has violated the provisions of this subchapter (except section 461 of this title) the Secretary shall investigate the complaint and if the Secretary finds probable cause to believe that such violation has occurred and has not been remedied he shall, without disclosing the identity of the complainant, bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate. Any member or subordinate body of a labor organization affected by any violation of this subchapter (except section 461 of this title) may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate.

Title IV

Title IV generally relates to election improprieties and places the exclusive authority to sue for post-election redress in the hands of the Secretary of Labor.

Title 29 U.S.C. § 481(e) provides for reasonable nomination opportunities, the eligibility of every member in good standing to be a candidate and hold office, the right to vote for or support the candidate of one's choice without being subject to penalty or disciplinary action, advance notice to all members of elections, and conducting elections in accordance with the union's by-laws and constitution except to the extent they are inconsistent with Title IV.

Section 482, the enforcement provision, permits a union member who has exhausted his internal remedies or who has invoked available remedies without obtaining a final resolution within three months after their invocation, to file a complaint with the Secretary of Labor. The challenged election is presumed valid pending a final decision. Upon investigating the complaint, the Secretary may bring a civil action against the labor organization for a violation of the subchapter. If the court finds that an election has not been held within prescribed time limits or that a violation of § 481 may have affected the outcome of an election, the court must declare the election void and direct the conduct of a new one under the Secretary's supervision. The Secretary then certifies the names of those elected, and the court enters a decree to that effect.

Section 483 specifies that this remedy for challenging an election is exclusive.

Harold Oliver's second term as president, when all the other officers and 103 union members petitioned the International president to impose a trusteeship on the Local. The purpose of the petition, of course, was to relieve Oliver of his presidency. Among the specifications in the bill of particulars submitted to an International special committee were that (1) Oliver had solicited new members into the Local at a time when there was insufficient work available for the current members of the Local; (2) he had controlled the appointment of foremen and thereby the hiring practices of management, to the detriment of senior members of the union; (3) in collusion with management, he had usurped the right of other officers and members of the Local to engage in collective bargaining; and (4) he had failed and refused to seek arbitration of grievances as provided for in the collective bargaining agreement after having been requested to do so by members and officers of the Local.

There were complaints, also, concerning the management of Local 795's Pension, Welfare and Vacation Trust Funds. Specifically, as a trustee for the Fund, McDonald objected to the $220 per week Oliver and the president of 795's sister Local 1303 were receiving as compensation for handling claims against the Funds.

After a hearing, the special committee recommended that Local 795 be placed in trusteeship. The committee found that Oliver never had any intention of implementing the seniority provisions of the Local's collective bargaining agreements, that employees were being selected for work without regard to seniority, and that Oliver had appointed supervisors to head the Local's election committees in order to insure his continued control of the Local's affairs. The ILA Executive Council then voted to invoke the trusteeship.

In April of 1971, the ILA president appointed the Trustee. He was Fred Field, a general organizer and vice-president of the ILA. Field was authorized to assume immediately the duties of trustee, to take all steps necessary to correct any abuses in the Local's pension and welfare fund operation, to negotiate and place into effect a seniority system for the protection of all longshoremen, and to remove, if necessary, any and all officers of the Local.

Oliver's alleged mismanagement of the Local's affairs and abuse of his powers as president caused the imposition of the trusteeship. Trustee Field acknowledged that Oliver drank heavily and was in trouble with respect to the trust funds. Nevertheless, Field did not remove Oliver from office. On the contrary, he delegated virtually all of his duties to Oliver. As should have been expected, this course met with dissatisfaction. By September, 1972, the amount owed by companies to the trust funds rose to over $658,000, with no legal attempt at collection. This was not all. The seniority plan was not effected, Oliver traveled to union meetings and conventions as an observer at the Local's expense, and the rosters of Local 795 and black Local 1303 had not been integrated.

On February 16, 1973, a complaint was filed with the Secretary of Labor, in which members of the Local asserted that the trusteeship had not "accomplished the purpose for which it was established and under present conditions there is no just cause to continue the trusteeship". The complaint also asserted that the continuance of the trusteeship was detrimental to the membership of the Local. Accordingly, the complaining members requested that the trusteeship be brought to an immediate conclusion, and an election for new officers be held at once.

The Secretary investigated the complaint and found probable cause to believe that no valid purpose would be served by a continuance of the trusteeship which had been in existence for more than 18 months. However, during the course of the investigation, the Secretary had information that the ILA intended to end the trusteeship and had set up a schedule for the election of new officers. Based upon this information,

the Secretary determined for the time being not to pursue legal action to terminate the trusteeship.

In June of 1973, Field set up the following schedule for resumption of the Local's autonomy.

(1) July 7, 1973—Membership meeting to explain Seniority Plan.

(2) August 4, 1973—Distribution of seniority cards.

(3) August 13, 1973—New hiring system under Seniority Plan to go into effect.

(4) September 1, 1973—Meeting for nomination of officers of Local 795.

(5) October 6, 1973—Election of officers.

(6) November 3, 1973—Installation of new officers.

This timetable for dissolution of the trusteeship was adhered to through the October 6 election, except that in the meeting of July 7, Oliver chose not to explain the Seniority Plan but sought approval of a new constitution and by-laws which would have had the effect of disqualifying both his opponents for the Local presidency. Because the constitution and by-laws were not approved by the International prior to election, they were deemed not to have any effect upon the eligibility of the candidates for the various offices.

On October 6, McDonald received 136 votes for president, Oliver received 115, and LeBeau 66; McDonald's plurality, 21.

After the winners were certified, a number of protests to the election were filed by individual members of the Local, such as that (1) McDonald was ineligible to hold union office because he had not been working or seeking work as a longshoreman for the year prior to the election, contrary to the provisions of the International's constitution and (2) LeBeau, who had been working as a supervisor for the Sealand Terminal Company, had not resigned this capacity sufficiently prior to the election, contrary to the

ILA constitutional provision prohibiting union officers or candidates from holding supervisory positions.

The District Court found that McDonald had been seeking work but was unable to find employment on the docks because of pressure imposed by Oliver upon gang foremen not to hire him. The Court also found that when LeBeau ran for the presidency he was no longer working as a supervisor and was therefore eligible for the office.

On October 22, 1973, through his attorney, McDonald wrote ILA President Gleason requesting information about the election protests so that "appropriate measures may be taken to insure the installation of duly elected officers". On October 24, Gleason wrote McDonald that he was awaiting a recommendation from the president of the South Atlantic & Gulf Coast District of the ILA before taking action. The following day, the district president telegraphed Gleason that the scheduled installation of officers should be stayed pending further investigation. The International's president concurred in the recommendation, and the ILA Executive Council voted to stay the installation of officers. The members of the Local were notified that a committee of three ILA vice-presidents had been appointed to investigate the election.

Because of the ILA's decision to stay the scheduled installation, plaintiffs filed suit on November 27, 1973, under Titles I and III of the LMRDA seeking, among other things, their installation as officers and an end to the trusteeship.

In the meantime, the ILA continued its investigation of the alleged election irregularities. On the basis of hearings held by the International in early January, the committee concluded that the October 6 election should be declared invalid. Specifically, the committee found that the following violations of the constitution and by-laws of the Local and of the International had influenced the election: (1) members who were not qualified were nominated and received

votes for the office of president (Mc-Donald and LeBeau); (2) ineligible persons were allowed to vote in the election; and (3) poll watchers for the various candidates were asked to leave the voting area before all the ballots had been cast. The committee also recommended that a new election be held under the auspices of the ILA.

Upon learning of these rulings, the plaintiffs appealed to ILA President Gleason on January 17, 1974. When they received no response, they lodged a complaint with the Secretary of Labor on January 24, 1974. The following day an investigation was commenced by Thomas Sutton, a Labor Department official. Sutton reported that he found no invalidating improprieties in the election and that duly elected officials of the Local were being unjustly kept from assuming their positions. Based upon the determination that there was probable cause to believe that continued maintenance of the trusteeship over the Local and failure to install the duly elected officers were violative of Titles III and IV of the LMRDA, the Secretary filed suit under both Titles on March 25, 1975.

Between the plaintiffs' complaint to the Secretary and the commencement of the Secretary's action, the ILA Executive Council affirmed the report of its investigation committee, set aside the election of October 6, and ordered a new election to be held on May 25, 1974. Upon learning of this development, the Secretary sought and obtained a temporary restraining order preventing the ILA from holding the proposed May election.

The District Court consolidated the action of the individual plaintiffs (Titles I and III) with the Secretary's action (Titles III and IV). Following a 7-day trial, the District Judge found that the individual plaintiffs had properly invoked the jurisdiction of Titles I and III relative to (1) the denial of job opportunities to those opposed to the union hierarchy, (2) the failure of the defendants to recognize plaintiffs' voting rights by voiding the October election, and (3) the con-

tinuation of the trusteeship. Plaintiffs were found to have unavailingly exhausted their internal union remedies, a prerequisite to Title I and IV actions. The District Court opinion noted that post-election relief is usually the sole prerogative of the Secretary, but found the allegations in this case to be much broader in scope than those typically advanced in a suit challenging the validity of an election. The Court felt that the individual plaintiffs were not only prosecuting their own interests, but also those of the union members whose votes were nullified by the defendants' actions.

Premised upon the finding that the October election was valid, the refusal to install the plaintiffs was deemed to "effect the outcome of an election", and to state a Title IV cause of action which could be maintained by the Secretary. Denying complainants their right to hold office was found to be contrary to the intent and meaning of § 401(e) of the LMRDA, 29 U.S.C. 481(e). The individual plaintiffs were allowed to amend their complaint to allege the same Title IV grounds as the Secretary and thereby intervene in his action.

The Court further held that it was not required to order a new election—that under Title I and its own inherent equity powers it could validate the October election if it were found to have been properly conducted.

A review of the election's propriety presented two sharply contested issues: (1) whether McDonald was an eligible candidate for president and (2) whether the other challenged aspects of the election might have affected its outcome. On the basis of the testimony of several witnesses, the Judge determined that McDonald had been seeking work on the docks for the requisite year but had been denied employment because of Oliver's pressure on the hiring foremen. The question concerning LeBeau's eligibility was whether he had resigned from his supervisory capacity sufficiently prior to the election. The Court found that he had done so. The evidence further disclosed that alleged violations relative to

voter eligibility and the removal of poll watchers were not well founded, nor would they have affected the outcome of the election.

Accordingly, on October 24, 1974, the Court declared the plaintiffs to have been duly elected on October 6, 1973, for a term of 2 years. It directed their immediate installation as officers and the trusteeship was ordered dissolved. The ILA was prohibited from declaring McDonald ineligible for office "because of any failure, omission, or lack of welfare benefit eligibility which precedes his being installed as President of Local 795 . . . .". Finally, the ILA was enjoined from further violating the provisions of Title III of the LMRDA.

McDonald was awarded back presidential pay from the Local dating from October 6 when he was elected, less what he had received from other employment. The individual plaintiffs were also allowed attorneys' fees in the amount of $10,000, plus $1207.07 expenses, against the ILA, Field, Oliver, and the Local.

Plaintiffs then proceeded to serve out their terms in office, which expired October 5, 1975, as per the order of the Court. Another election took place on October 4, 1975. All those chosen in the election of October 6, 1973 were re-elected, with one exception. We heard oral argument on this appeal on October 7, 1975.

### The Appellate Contentions

Appellants argue that there was no Title I jurisdiction for relief to the individual plaintiffs; that only the Secretary of Labor had authority to seek post-election relief but that his Title IV authority failed for lack of exhaustion of internal union remedies; that the Secretary had no authority to seek, nor had the Court the power to order, installation of the Local officers; that the Court improperly resolved the issue of eligibility of two of the candidates for president of the Local; and the award of attorney fees was without basis.

The plaintiff-appellees assert that the attorney fee allowance was inadequate and that the District Court erred in limiting the terms of office to two years instead of three.

The issues raised by the appellants, except for back pay and attorney fees, have been mooted by the election of October 4, 1975.

### Mootness

■ Under Article III of the Constitution, federal courts have jurisdiction of *actual* cases or controversies. The controversy must exist when the suit is instituted and it must exist at all stages of appellate review. See *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

■ Under the facts of this case we have no difficulty in concluding that the expiration of plaintiffs' two-year term of office and the holding of a scheduled election for Local officers while this appeal was in progress has extinguished the underlying controversy and rendered this case moot as to all issues except the attorney fees awarded the individual plaintiffs and back pay awarded McDonald. To be more specific, the individual plaintiff-appellees do not now hold Local office by virtue of the District Court judgment that the October 6 election was valid. Their present tenure is based on their victory in the election held October 4, 1975. The validity of that election is not an issue in this appeal.

*Wirtz, Secretary of Labor, v. Local 153, Glass Bottle Blowers Association,* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968) was a case in which a Section 401 violation had occurred because the union imposed an unreasonable restriction on members' eligibility as candidates for office. Another regular election had been held. The Supreme Court ruled that this election did not moot the case because the Secretary of Labor had the right to

a court order voiding the challenged election and directing a new election to be *conducted under his supervision* (emphasis ours). To like effect, see the companion case of *Wirtz v. Local 125, Laborers' International Union*, 389 U.S. 477, 88 S.Ct. 639, 19 L.Ed.2d 716 (1968). In our present case, however, the Secretary was not seeking to set aside an election as invalid but, to the contrary, took the position that the election was valid. That position was sustained by the District Court and the Secretary has been granted the relief he sought. The trusteeship is ended. The plaintiffs have served the terms to which they were elected, the terms which the Secretary sought to vindicate. Accordingly, the public interest inherent in the Secretary's suit has been satisfied.

Nothing remains but a consideration of the attorney fees and the back pay awarded pursuant to the suit brought by those other than the Secretary.

### Back Pay and Attorney Fees Awarded Individual Union Members Under Titles I and III

Although the injunction-related issues asserted on behalf of the individual union member plaintiffs are moot for exactly the same reasons applicable to the Secretary's complaint, the awards of back pay and attorney fees are yet alive for appellate resolution.

This necessitates a determination of whether such relief is available under Titles I and III of the LMRDA. If it is, are the awards justified? See *Kerr v. Screen Extras Guild, Inc.*, 9 Cir. 1972, 466 F.2d 1267, 1269, *cert. denied*, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973); *Yablonski v. United Mine Work-*

ers *of America*, 1972, 148 U.S.App.D.C. 177, 459 F.2d 1201, 1202.

### Availability of Damages and Attorneys' Fees

The civil remedy provisions of both Titles I and III, 29 U.S.C. §§ 412 and 464 permit actions "for such relief (including injunctions) as may be appropriate". When dealing with such a broad grant of equitable jurisdiction in a regulatory statute, the principle is well established that:

> Congress . . . must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As this Court long ago recognized "there is inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature."

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960).[2]

Relief which is incident and ancillary to the primary claim is therefore properly within the judge's discretion, *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Meredith v. Winter Haven*, 320 U.S. 228, 235, 64 S.Ct. 7, 88 L.Ed. 9 (1943).

Under this rationale, compensatory damages, including lost pay for officers who were improperly removed, have been allowed as necessary to afford complete relief.[3]

Although the cited cases all deal with actions under § 102 of the LMRDA, 29 U.S.C. § 412, the identical language of the Title III trusteeship provisions should authorize the same result.

---

**2.** See also *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 16–20, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).

**3.** *International Brotherhood of Boilermakers v. Braswell*, 5 Cir., 388 F.2d 193, 199, *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968); *Kerr v. Screen Extras Guild, Inc.*,

9 Cir. 1972, 466 F.2d 1267, 1270, *cert. denied*, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973); *International Brotherhood of Boilermakers v. Rafferty*, 9 Cir. 1965, 348 F.2d 307, 314–15; *Salzhandler v. Caputo*, 2 Cir. 1963, 316 F.2d 445, 451; *Retail Clerks Union, Local 648 v. Retail Clerks Int'l Ass'n*, D.D.C.1969, 299 F.Supp. 1012, 1021.

In *Hall v. Cole*, 412 U.S. 1, 10, 93 S.Ct. 1943, 1949, 36 L.Ed.2d 702 (1973), the Supreme Court stated:

Thus, § 102 does not "meticulously detail the remedies available to a plaintiff," and we cannot fairly infer from the language of that provision an intent to deny to the courts the traditional equitable power to grant counsel fees in "appropriate" situations.

Founded upon the "common benefit" approach clearly articulated in *Mills v. Electric Auto Lite*, 396 U.S. 375, 392–94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), *Hall*, 412 U.S. at 5–6, 93 S.Ct. at 1946 noted the established exception to the American rule against awarding attorneys' fees in cases in which the plaintiff's successful litigation confers

"a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." . . . "Fee shifting" is justified in these cases, not because of any "bad faith" of the defendant but, rather, because "[t]o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense."

Analogized to reimbursement of fees out of a corporate treasury, awarding fees against the local union merely shifts the costs of litigation to the class that benefited from it. *See also Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882).

Although the primary purpose of an individual's lawsuit is obviously to vindicate his own rights or facilitate his own candidacy, there can be little doubt that he renders a substantial service to the union as an institution and to its members individually in protecting local democratic processes through Titles I and

III. The successful litigant dispels the "chill" cast upon the rights of others. *Hall*, 412 U.S. at 8, 93 S.Ct. 1943; *Yablonski v. United Mine Workers of America*, 1972, 151 U.S.App.D.C. 253, 466 F.2d 424, 430, *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973).

The teaching of *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), that under the American rule the prevailing party is ordinarily not entitled to collect a reasonable attorneys' fee from the loser, does not mandate that result in equitable suits under Titles I or III. The Court stated on pages 257–59, 95 S.Ct. on page 1621:

In *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881), the 1853 Act was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. That rule has been consistently followed.

*Mills v. Electric Auto-Lite* and *Hall v. Cole* were then cited as recent authority for the same proposition.

Additionally, as a basis for awarding attorneys' fees in Title I suits, the Court has recognized that such fees are clearly consonant with the congressional intent to afford necessary protection of the rights and interests secured by the Act. Quoting the Court of Appeals, *Hall* stated 412 U.S. at 13, 93 S.Ct. at 1950:

Not to award counsel fees in cases such as this would be tantamount to repealing the Act itself by frustrating its basic purpose. It is difficult for individual members of labor unions to stand up and fight those who are in charge. The latter have the treasury of the union at their command and the paid union counsel at their beck and call while the member is on his own. . . . An individual union member

could not carry such a heavy financial burden. Without counsel fees the grant of federal jurisdiction is but a gesture for few union members could avail themselves of it. 462 F.2d at 780–81.[4]

Although the financial burden inherent in Title I suits where an individual has no alternative but to bring the action himself supports the award of fees, this is merely an additional justification and does not mandate the denial of fees when a union member may also seek governmental intervention on his behalf, as in Title III. The primary factors of identical equitable relief language and common benefit to the union's membership are just as viable in Title III as in Title I. At the least, a member's suit to dissolve a trusteeship may aid the Secretary of Labor in resolution of the issues; the members may seek relief different from or in addition to that sought by the Secretary which they do not wish to have barred by the *res judicata* effect of the Secretary's suit imposed by 29 U.S.C. § 466; or at the most, the Secretary may refuse to file a suit and the members *must* seek their own relief. In numerous statutes Congress has recognized the propriety of allowing attorney fees even though an individual may invoke the government's legal resources to prosecute a cause.[5] We hold, therefore, under the common benefit theory that an award of attorney fees is permissibly within equitable discretion in both Title I and Title III cases.

As noted earlier in *Mills* and *Hall*, the fees are to be granted against the *local union* to avoid unjust enrichment of the membership. We have found only one case in which fees were imposed on individuals or the international, *Robins v. Schonfeld*, S.D.N.Y.1971, 326 F.Supp. 525, 531. We think that the common benefit rationale does not justify such a punitive award. Only if an individual or the international has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" should fees be shifted to others besides the local. *See Alyeska* 421 U.S. at 247, 95 S.Ct. 1612 and *Hall* 412 U.S. at 5, 93 S.Ct. 1943.

Examining the Title III claim first, the Court undoubtedly had jurisdiction over the case. Congress recognized that trusteeships had, at times, been used as a means of consolidating the

---

4. *See also Yablonski v. United Mine Workers of America*, 1972, 151 U.S.App.D.C. 253, 466 F.2d 424, *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973); *Gartner v. Soloner*, 3 Cir. 1967, 384 F.2d 348, 355, *cert. denied*, 390 U.S. 1040, 88 S.Ct. 1633, 20 L.Ed.2d 302 (1968); *Robins v. Schonfeld*, S.D.N.Y.1971, 326 F.Supp. 525; *Sands v. Abelli*, S.D.N.Y.1968, 290 F.Supp. 677, 686.

5. For example, § 16 of the Fair Labor Standards Act, 29 U.S.C. § 216, permits fees in a suit to recover unpaid minimum wages or overtime compensation even though an aggrieved person may file a complaint with the Secretary of Labor to bring the action. Section 308 of Part III of the Interstate Commerce Act, 49 U.S.C. § 908, allows a private action with recovery of attorney fees or a complaint with the ICC to obtain the same relief for certain violations of the Act by water carriers. Title II of the Civil Rights Act of 1964, § 204, 42 U.S.C. § 2000a–3(b), provides for fees in public accommodation and statutory discrimination cases despite the authority of the Attorney General to sue on the basis of the same pattern or practice under § 2000a–5; the Supreme Court in *Newman v. Piggie Park Enter-*

*prises, Inc.*, 390 U.S. 400, 401, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) noted that the nation had to rely in part on private litigation to secure broad compliance with the law and that allowing attorney fees encouraged individuals to seek relief. Section 718 of Title VII of the Emergency School Aid Act, 20 U.S.C. § 1617, as applied in *Northcross v. Board of Education of Memphis City Schools*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), authorizes fees in school desegregation cases even though the Attorney General, under Title IV, 42 U.S.C. § 2000c–6, may seek redress of the situation upon the filing of a complaint by one who cannot afford to sue. The Servicemen's Readjustment Act, 38 U.S.C. § 1822, permits attorney fees in an action to recover the excess above the reasonable purchase price of property bought with a VA loan or a suit by the Attorney General upon request.

The policies behind these statutes are as varied as their subject matter, but they all lend credence to the proposition that availability of government action does not automatically foreclose recovery of attorney fees in a private suit if they are otherwise authorized by law.

power of corrupt union officers, plundering and dissipating the resources of local unions, and preventing growth of competing political elements within the organization. To determine whether a trusteeship is being abused in such a manner or is meeting the enumerated purposes of the statute, Title III must be construed in light of the various other provisions of the LMRDA. The purpose of the Act as a whole

is not only to stop and prevent outrageous conduct by thugs and gangsters but also to stop lesser forms of objectionable conduct by those in positions of trust and to protect democratic processes within union organizations. . . . [T]he rights of individual members of a labor union are protected by federal statute with a view to allowing those members to conduct local matters with a minimum of outside interference. In short, local affairs are to be governed by local members under democratic processes.

*United Brotherhood of Carpenters and Joiners of America v. Brown*, 10 Cir. 1965, 343 F.2d 872, 882.

The Secretary had already found that the trusteeship was not fulfilling statutory purposes and refrained from filing suit only because Field initiated an election timetable. The conduct of Oliver, the trustee's agent, in attempting to disqualify his opponents, Field's lack of supervision of the Local's affairs and election process, and the International's voiding of the election and continuation of a presumptively invalid trusteeship only exacerbated the situation and made a mockery of "internal democratic processes".

█ In asserting their rights against the trusteeship, the members were not required to exhaust internal remedies. Unlike Titles I and IV, Title III contains no exhaustion requirement. Intra-union appeals would be unlikely to provide much relief since the protests would be to the very International which invoked the trusteeship. *United Brotherhood of Carpenters* at 880; *Hotel & Restaurant*

*Employees & Bartenders' Int'l v. Del Valle*, 1 Cir., 328 F.2d 885, 886, *cert. denied*, 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964); *Parks v. International Brotherhood of Electrical Wkrs.*, 4 Cir., 314 F.2d 886, 923, *cert. denied*, 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963). Thus, plaintiffs properly stated their claim before the District Court, and the findings of fact below conclusively mandated the dissolution of the trusteeship.

### The Back Pay Issue

This brings us to the back pay issue. Obviously the award cannot be justified unless the Court had authority to order the officers installed. Having ordered the trusteeship dissolved as it should have been, some determination had to be made on where to place control of the Local's affairs. At least two circuits have approved the use of the court's equitable jurisdiction to direct the holding of a special election in such a situation. *Brennan v. United Mineworkers of America*, 1973, 155 U.S.App.D.C. 24, 475 F.2d 1293, 1296; *Schonfeld v. Raftery*, S.D.N.Y., 271 F.Supp. 128, 148, *aff'd*, 2 Cir. 1967, 381 F.2d 446.

█ If a court may order an election held with the results to be confirmed by its certification, no cogent reason appears to suggest that it may not or should not validate an election already properly held. In doing so here, all the District Court really did was make a collateral determination on the eligibility of two candidates. The same thing was done in *Burch v. International Ass'n of Machinists & Aerospace Wkrs.*, S.D.Fla. 1971, 337 F.Supp. 308, which ordered the termination of a trusteeship and declared plaintiff a proper nominee for the pending election.

In determining McDonald's eligibility, the District Court found that he had been seeking work in the trade for the requisite year, but had been denied employment because of Oliver's coercion of supervisors. In making that finding the trial judge was faced with a credibility

choice between witnesses, and we do not appraise his decision as clearly erroneous.

Appellants' primary objection is that this constituted determination of a blacklisting charge, an unfair labor practice which can be considered only by the NLRB under § 8 of the National Labor Relations Act, 29 U.S.C. § 158.

The pre-emption doctrine which places practices "arguably" condemned by § 8 within the exclusive jurisdiction of the NLRB developed in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The rationale for deference of state and federal courts to the competence of the Board is to avert interference with national labor policies, *William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville & Vicinity*, 417 U.S. 12, 15, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974); *Local 100, United Ass'n of Journeymen & Apprentices v. Borden*, 373 U.S. 690, 693, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963).

*Borden* construed the union membership rights protected by § 8(a)(3) and incorporated in § 8(b)(2) to embrace participation in union activities and maintenance of good standing as well as mere adhesion to the labor organization. Therefore if a labor organization attempts to cause an employer to discriminate against an employee in order to discourage his participation in union activities, a § 8 cause of action is "arguably" present and the NLRB has exclusive jurisdiction. *See also Scofield v. NLRB*, 394 U.S. 423, 428, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). *Borden* went on to note, however, that the conduct *upon which that suit was centered* was conduct the lawfulness of which could initially be judged only by the federal agency, not by the *state* court where the

action was filed. The Court at 697 specifically declined to speculate on the effect of *Garmon* on *International Ass'n of Machinists v. Gonzales*, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958). *See Amalgamated Assoc. of Street, Electric Railway & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 296–98, 91 S.Ct. 909, 29 L.Ed.2d 473 (1971).

*Gonzales* permitted collateral relief for lost employment where the suit "focused on purely internal union matters, *i. e.*, on relations between the individual plaintiff and the union not having to do directly with matters of employment . . ." and where the principal relief sought was restoration of union membership rights. Thus, in dealing with meritorious Title I suits, distinctly collateral allegations which might also constitute unfair labor practices have been held not to oust the court of jurisdiction. The Third Circuit explained:

The explicit Congressional declaration and the reasoning, in an analogous situation, of the Supreme Court in *Gonzales*, establish that the district court is competent to retain jurisdiction of a Section 101(a)(5) suit even when elements of the case are arguably subject to the Board's jurisdiction. "The fact that the Act preserves to union members all remedies 'under any State or Federal law or before any court or other tribunal . . .,' § 103 of the LMRDA, 29 U.S.C. § 413 . . . only means that the new federal protection was superimposed on protection already available in other forums . . .. Summers, 'The Law of Union Discipline: What the Courts Do in Fact,' 70 Yale L.J. 175, 176 (1960)."

*Rekant v. Shochtay-Gasos Union Local 446.*, etc., 3 Cir. 1963, 320 F.2d 271, 275.[6]

---

**6.** Suits under the LMRDA which involve unfair labor practices are analogous to actions under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. An individual may sue to redress a violation of a collective bargaining agreement even though the violation itself may constitute an unfair labor practice. Like the

LMRDA, § 301 has been held to confer substantive rights upon union members and Congress has been deemed to have directed the courts to formulate and apply federal law to these suits. *Garmon* has been held not to pre-empt individual actions under § 301. *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct.

*Parks v. International Brotherhood of Electrical Wkrs.,* 4 Cir. 1963, 314 F.2d 886, 922, went on to state, "Congress did not intend that before securing the rights it made enforceable in federal courts, individuals should wait for the Labor Board to pass upon such matters as might also be within its competence." [7]

The case primarily relied upon by appellants, *Green v. Local 705, Hotel & Restaurant Employees, etc.,* E.D.Mich. 1963, 220 F.Supp. 505, is not persuasive on the pre-emption issue. Therein, the court found that plaintiffs had failed to state a Title I cause of action and were attempting to argue a § 8 case under the LMRDA. The primary finding in the grant of incidental relief in this case, on the other hand, was that McDonald had been seeking work in the trade and was, therefore, an eligible candidate. The finding as to why he had not actually been working was purely collateral.

As to LeBeau's candidacy, apparently the only issue raised by the protest was whether he had resigned from his supervisory position sufficiently prior to the election. The District Court correctly found that he had. Appellants now contend that the Court should also have considered, and declared LeBeau ineligible upon the ILA constitutional stricture of working or seeking work in the trade for the year preceding the election. This issue apparently was not addressed by the original protest, the ILA's investigation, the Labor Department's investigation, the pleadings, or the exhibits; and was only once fleetingly and indirectly mentioned at trial. Although this point is raised belatedly, we feel that LeBeau, in his supervisory capacity, was directly and intimately involved in the trade or craft of being a longshoreman. We are dealing with broad generic words and a man closely associated with the activities they connote.

The other errors which were alleged in the original election protests were not raised by appellants as issues for appellate review. Not until their reply brief did they belatedly contest the District Court's findings in this regard. We deem that these points of contention could not have affected the election, and are therefore immaterial. The challenges to the election's validity are without merit; the trial Judge's findings in this regard are not clearly erroneous.

Full, complete, and equitable relief in this case, then, must certainly include validation of the election results. One of the primary purposes of a trusteeship is assurance of internal democratic functioning of a union. When a trusteeship is employed to thwart that functioning, Congressional intent is best served by placing management of the Local in the hands of those selected by the union members. Here they had made that selection.

We fully recognize that the courts must exercise sound reluctance to interfere with internal union affairs. Particularly in regard to post-election remedies which may be pursued only by the Secretary of Labor under Title IV, we do not intend to place union officers in a strait jacket by permitting them to be constantly haled into court after every election by any dissident member who is dissatisfied with the results. An unmeritorious claim under some other Title will not be permitted as a bootstrap to consider what is actually only a Title IV action.[8]

267, 9 L.Ed.2d 246 (1962). *See Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957).

7. Other courts have similarly held. *Grand Lodge of the Int'l Ass'n of Machinists v. King,* 9 Cir., 335 F.2d 340, *cert. denied,* 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964); *Bussey v. Plumbers' Local No. 3,* 10 Cir. 1961, 286 F.2d 165; *Robertson v. Banana Handlers Int'l Longshoremen's Ass'n, Local 1800,* E.D.La.1960,

183 F.Supp. 423. *See Detroy v. American Guild of Variety Artists,* 2 Cir., 286 F.2d 75, *cert. denied,* 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); *Robins v. Schonfeld,* S.D. N.Y.1971, 326 F.Supp. 525; *Burris v. International Brotherhood of Teamsters, etc.,* W.D.N. C.1963, 224 F.Supp. 277.

8. *See, e. g., Trbovich v. United Mine Workers of America,* 404 U.S. 528, 531–35, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972); *Calhoon v. Harvey,* 379

■ Although committed to minimal intervention, the courts should use warranted intervention, effective to enforce the guarantees of the Act. Where the international, under the guise of a trusteeship, places obstacles in the way of effective union democracy or appears to do so, the court cannot give that conduct any recognition when it offends equity and the LMRDA. *Cf., Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 473, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 228, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

■ Unlike the plethora of Title I cases in which disgruntled union members sought to directly attack an election because of an alleged violation of their "bill of rights", we are dealing here with an unequivocally invalid trusteeship; a trusteeship which merely perpetuated the evils it was supposed to correct. In such a case where intervention is necessary, the district court is bound by equity to afford complete justice. This it could not do here without considering whether the refusal to install the officers and continuation of the trusteeship was improper. Having so found, the next logical and fair step was to order the plaintiffs into office. In this case, we also have the advantage of the Secretary's concurrence that such relief was proper. Compensatory damages in the form of back pay are, therefore, a proper form of relief in this case.

■ Having succeeded on the merits, plaintiffs returned democratic processes and autonomy to the Local to the common benefit of its members. Attorneys' fees as awarded by the District Court against the Local are appropriate.

### Title I Claims

We find it unnecessary to reach specifically appellants' questions regarding plaintiffs' Title I claims. McDonald *et al.* had to prove essentially the same facts to sustain the primary and incidental relief we have found proper under Title III as they would have in their voting rights case. Therefore, the full amount of the fees awarded is justified.

Without expressly reaching the issue, we do note that a Title I action standing alone and expressly directed to post-election relief is of doubtful validity.

### Bad Faith

As discussed earlier, attorney fees directed against any party but the Local must be justified on a bad faith rather than a common benefit rationale. Although the trial judge did not use the "magic words", his factual findings are replete with the most glaring examples of bad faith and oppressiveness.

■ The International, through its appointed agent Field, was responsible for seeing that the trusteeship was validly conceived, operated, supervised, and terminated at an appropriate time. This it not only failed to do but it actually resisted it. Oliver's mismanagement continued to characterize his activities; a fact recognized by Field, who chose to delegate virtually all of his authority to him. Directly contrary to the enunciated purposes of the LMRDA, the trusteeship was used to stifle democratic processes in the Local and to perpetuate a highly inept, possibly a corrupt, administration.

Oliver, in his designated official capacity, sought to consolidate his grip on the

U.S. 134, 140–41, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964); *Nelms v. United Ass'n of Journeymen & Apprentices of Plumbing, etc.*, 5 Cir. 1968, 405 F.2d 715, 718; *Cefalo v. Moffett*, 1971, 146 U.S.App.D.C. 117, 449 F.2d 1193, 1200; *Davis v. Turner*, 9 Cir., 395 F.2d 671, *cert. denied*, 393 U.S. 987, 89 S.Ct. 467, 21 L.Ed.2d 449 (1968); *Mamula v. United Steelworkers of America*, 3 Cir. 1962, 304 F.2d 108, 109;

S.Rep.No.187, 86th Cong., 1st Sess. 397, 417 (1959); Hearings on S. 505 et al. Before the Subcomm. on Labor of the Sen. Comm. on Labor and Public Welfare, 86th Cong., 1st Sess. 567 (1959). These authorities are in agreement that questions of eligibility for office, qualifications of candidates, nomination procedures, and election processes are normally reserved for a suit by the Secretary.

union, to remove potential threats to his power by blacklisting or securing passage of bogus election qualifications, and, when faced with defeat in spite of his efforts, to throw out the election. The response of Field and the International to these efforts was bold-faced co-operation. Not until the Secretary of Labor moved to intervene did Field make an effort to do his job and to set in motion the machinery to reinstate local control.

Two executive board members of the International supervised the election. They asked if there were any protests concerning the eligibility of voters or candidates, and did not receive, find, or make any. Once the election results were in, however, the International refused to abide by them. It chose instead to disqualify the apparent winner primarily on the basis of constitutional provisions inappropriately passed by Oliver, unapproved by the International, and stipulated to have been without effect at the time of the election.

We need not speculate on the possible motives of those who were placed in a fiduciary capacity by the trusteeship. The record shows that their actions were blatantly contrary to those principles which the LMRDA intended to foster, and they persisted in such conduct despite the protests of large numbers of the Local's members.

In the words of the District Court, this suit was obviously "necessary for the relief obtained". The order making Oliver, Field, and the International jointly and severally liable for attorney fees and expenses along with the Local is sustained.

### The Cross Appeal

The cross appellants (individual plaintiffs) argue that attorney fees should have included compensation for 387.15 hours of time spent, rather than the 250 hours allowed by the Court. It seems clear from the record, however, that plaintiffs sought pay for time spent on aspects of the case common to those pursued by or exclusively within the province of the Secretary [Titles III and IV]. We are unable to say that the trial judge, intimately acquainted as he was with all facets of this difficult case and with these overlapping efforts, abused his discretion in appraising the amount appropriately awardable. We feel no warrant to interfere with that appraisal, *Weeks v. Southern Bell Tel. & Tel. Co.*, 5 Cir. 1972, 467 F.2d 95; *Johnson v. Georgia Highway Express, Inc.*, 5 Cir. 1974, 488 F.2d 714.

As to the two year term of office prescribed by the District Court, Article XIII, Section 1, of the ILA Constitution so provided unless the Local By-laws specified otherwise and there was no such specification in effect at the time of the election.

The Judgment of the District Court rendered in response to the Secretary's suit being moot, as hereinabove set forth, the appeal as to that aspect of the case is dismissed.

In all other respects the Judgment of the District Court is

Affirmed.